IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 05-cv-01336-PSF-BNB

SHARON BETHEL, individually and as conservator and guardian of David Bethel, an incapacitated person,

Plaintiff,

v.

UNITED STATES OF AMERICA, by and through
VETERANS ADMINISTRATIVE MEDICAL CENTER OF DENVER, COLORADO,
JOHN DOE 1, whose true name is unknown, and
JOHN DOE 2, whose true name is unknown,

Defendants.
_____

**ORDER**
_____

This matter is before me on the **Plaintiffs' Motion to Compel Discovery Responses and Request for Forthwith Hearing** [Doc. # 139, filed 2/16/2007] (the "Motion to Compel"). I held a hearing on the Motion to Compel, ruled on some of the issues raised, and took some issues under advisement. I now GRANT IN PART and DENY IN PART the Motion to Compel with respect to the issues taken under advisement.

I.

This is an action for damages under the Federal Tort Claims Act ("FTCA") arising out of injuries sustained by David Bethel while undergoing surgery at the Veterans Administration Medical Center in Denver, Colorado, on September 10, 2003. Dr. Robin Slover, M.D., was the anesthesiologist during that surgery in question. Although Dr. Slover has been dismissed as a party to the suit, the United States has identified her as a non-party at fault.

The plaintiffs describe the facts underlying their claims as follows:

> On September 10, 2003, Mr. Bethel was scheduled to undergo a surgical procedure to repair an anal fistulectomy. Mr. Bethel was taken to an operating room and administered 2 mg of Versed. After the administration of Versed, Mr. Bethel became agitated and experienced obvious trouble breathing. . . . During the failed attempts to intubate Mr. Bethel, Mr. Bethel's arterial oxygen percent saturation failed to register on the monitors. Chest compressions were preformed on Mr. Bethel for approximately 10 minutes. Ultimately, an emergency tracheotomy was performed. However, as a result of the multiple failed and inadequate attempts to intubate Mr. Bethel and the negligent administration and management of anesthesia, Mr. Bethel suffered cardiac arrest and significant hypoxia, lasting between 10 and 20 minutes.

*Scheduling Order* [Doc. # 118, filed 11/21/2006] at p.2. As a result, Mr. Bethel suffered a disabling brain injury.

At issue here are the following requests for production of documents served by the plaintiffs on the United States:

> **REQUEST NO. 9:** Produce any and all documents pertaining, in any way, to Robin Slover, M.D. This request specifically includes, but is not limited to, the following:
> 
> \* \* \*
> 
> (b) Patient outcome information (*see* Anesthesiology Contract, p.10) reported by or about Dr. Slover prior to September 10, 2003;
> 
> (c) Morbidity and mortality reports pertaining to Dr. Slover prior to September 10, 2003, including any documents pertaining to Dr. Slover maintained by VAMC's risk management or by the U.S. Attorney's Office;
> 
> \* \* \*
> 
> (e) Chief of staff's verification (Staff Bylaws, Article V, Section 6) and audits of records to ensure Dr. Slover's Compliance with the Staff Rules and Bylaws;
> 
> (f) Documents pertaining to "organizational performance improvement," "patient care evaluation" and "ongoing performance improvement peer review" involving Dr. Slover, including any such

>reviews conducted in connection with Mr. Bethel (Staff Rules, Section 8(A)(2), (3) and (6));
>
>     \* \* \*
>
>(j) Minutes of all Medical Staff Meetings at which Dr. Slover was addressed or discussed. . . .

*Motion to Compel* at Exh.2, pp.1-3.

The United States responded to these requests as follows:

>[(b)] In response to (b) above, outcome data for Dr. Slover is found in the Peer Review folder that is maintained in the Anesthesiology Office. Peer Review documents have statutory protection as they contain information regarding an activity carried out by or for the Department for the purpose of improving the utilization of health resources in Department health care facilities as contained under 38 U.S.C. §5705 and VHA Directive 2002-043, Quality Management (QM) and Patient Safety Activities That Can Generate Confidential Documents. See attached privilege log.

*Defendant United States' Second Supplemental Response to Plaintiffs' Fourth Set of Discovery to Defendant United States of America* (the "Second Supplemental Response")*,* Exh. H at p.3.

>(c) The VA does not have any documents responsive to this request pursuant to the VA record retention policies. Furthermore, if this information were available, this information is protected under the VA quality assurance privilege and precluded from being produced. *See*, 38 U.S.C. § 5705.

*Motion to Compel* at Exh 2, p.4.

>[(e)] In response to (e) above, the information requested is protected under the VA quality assurance privilege and is precluded from being produced. See, 38 U.S.C. § 5705. However, without waiving this objection, this function is completed by the Service Chief in the Peer Review Process. Please see Response to Request for Production 9(b) above. Please see privilege log.
>
>[(f)] In response to (f) above, upon further diligent search of documents, some quality assurance documents have been found responsive to this request. However, this information is protected

3

>under the VA quality assurance privilege and is precluded from
>being produced. See, 38 U.S.C. § 5705. Please see privilege log.
>
>[(j)]  In response to (j) above, diligent search pursuant to the
>continuing duty to supplement discovery has revealed the existence
>of August 29, 2002 minutes of the Professional Standards Board.
>A redacted copy of this set of minutes is attached as Attachment Q.

*Second Supplemental Response* at pp.3-4.

The United States has prepared a privilege log, <u>see</u> *United States' Privilege Log--Medical Malpractice Litigation 3/30/2007* (the "Privilege Log"), identifying 29 responsive documents withheld as privileged pursuant to 38 U.S.C. § 5705. The plaintiffs dispute the applicability of the privilege.

II.

Discovery in the federal courts is governed by the Federal Rules of Civil Procedure, regardless of whether jurisdiction is based on a federal question or diversity of citizenship. <u>Atteberry v. Longmont United Hospital</u>, 221 F.R.D. 644, 646 (D. Colo. 2004). Where, as here, there is a claim that discovery should not be had based on a privilege, I must determine whether federal or state law governs the existence of the claimed privilege. <u>Id</u>. Federal law governs the application of privileges in cases, like this one, brought under the Federal Tort Claims Act. <u>Syposs v. United States</u>, 179 F.R.D. 406, 411 (W.D.N.Y. 1998); <u>Galarza v. United States</u>, 179 F.R.D. 291, 293 (S.D. Cal. 1998).

The party asserting a privilege has the burden of showing that the privilege applies. <u>Atteberry</u>, 221 F.R.D. at 649; <u>Epling v. UCB Films, Inc.</u>, 2000 WL 1466216 *19 (D. Kan. Aug 7, 2000). To carry that burden, the party claiming privilege must make a "clear showing" that the withheld information is privileged. <u>Epling</u>, 2000 WL 1466216 at *19. That party also must

describe in detail the documents withheld and provide the "precise reasons" for the applicability of the asserted privilege. Id. In particular, Rule 26(b)(5), Fed. R. Civ. P., requires:

> When a party withholds information otherwise discoverable under these rules by claiming that it is privileged . . ., the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.

The United States, as the party asserting the VA quality assurance privilege, must "provide sufficient information to enable the plaintiffs and the court to determine whether *each element* of the asserted objection is justified." Atteberry, 221 F.R.D. at 648, quoting Epling, 2000 WL 1466216 at *19 (original emphasis). A blanket claim of privilege does not suffice. Id. at 648-49.

The framework for discovery established by the Federal Rules of Civil Procedure evidences a policy favoring the full disclosure of facts before trial to aid in the search for the truth. See Wei v. Bodner, 127 F.R.D. 91, 96 (D.N.J. 1989). Consistent with that policy, evidentiary privileges are disfavored. See Herbert v. Lando, 441 U.S. 153, 175 (1979). Those privileges, which are "in derogation of the search for the truth," are "not lightly created nor expansively construed." United States v. Nixon, 418 U.S. 683, 710 (1974).

III.

Section 5705, 38 U.S.C., establishes a statutory privilege for documents created by or for the Veterans Administration as part of a medical quality-assurance program. The statute defines a "medical quality-assurance program" as follows:

5

> [W]ith respect to any activity carried out on or after October 7, 1980, a Department systemic health-care review activity designated by the Secretary to be carried out by or for the Department for either [improving the quality of medical care or improving the utilization of health-care facilities].

58 U.S.C. § 5705 (c).

Extensive regulations have been promulgated to effectuate the privilege created by § 5705, and they are contained in 59 C.F.R §§ 17.500 *et seq*. The regulations specify four categories of quality assurance reviews subject to the privilege created by § 5705:

(1) "Monitoring and evaluation reviews conducted by a facility," 59 C.F.R. § 17.501(a)(1);

(2) "Focused reviews which address specific issues or incidents and which are designated by the reviewing office at the outset of the review as protected by 38 U.S.C. § 5705 and the regulations in §§ 17.500 through 17.511," id. at § 17.501 (a)(2);

(3) "VA Central Office or Regional general oversight reviews to assess facility compliance with VA program requirements if the reviews are designated by the reviewing office at the outset of the review as protected by 38 U.S.C. § 5705 and the regulations in §§ 17.500 through 17.511," id. at § 17.501(a)(3); and

(4) "Contracted external reviews of care, specifically designated in the contract or agreement as reviews protected by 38 U.S.C. § 5705 and the regulations in §§ 17.500 through 17.511." Id. at § 17.501 (a)(4).

For any quality assurance review to be subject to the privilege created by § 5705, however, it must comply with the requirements of 59 C.F.R. § 17.501(b):

> The Under Secretary for Health, Regional Director or facility
> Director will describe in advance in writing those quality assurance
> activities included under the classes of healthcare quality assurance
> reviews listed in paragraph (a) of this section. Only documents and
> parts of documents resulting from those activities which have been
> so described are protected by 38 U.S.C. § 5705 and the regulations
> in §§ 17.500 through 17.511. If an activity is not described in a VA
> Central Office or Regional policy document, this requirement may
> be satisfied at the facility level by description in advance of the
> activity and its designation as protected in the facility quality
> assurance plan or other policy document.

In this case, the United States relies on VHA Directive 2002-043 issued on July 18, 2002, and titled "Quality Management (QM) and Patient Safety Activities That Can Generate Confidential Documents" ("Directive 2002-043"), as the writing prepared in advance which satisfies the requirements of 59 C.F.R. §17.501(b). A copy of *Directive 2002-043* was filed with the *Defendant's Response to Motion to Compel* [Doc. # 147, filed 3/13/2007] (the "Response") as Attachment 4. *Directive 2002-043* authorizes five categories of reviews subject to the quality assurance privilege created by § 5705:

(1) "**Monitoring and Evaluation Reviews**," *Directive 2002-043* at p.2, which include (a) tort claim peer reviews; (b) morbidity and mortality reviews; (c) occurrence screening; (d) drug usage evaluation; (e) utilization review; (f) surgical and other procedure usage evaluation; (g) medical records review; (h) blood usage review; (i) adverse event and close call reporting; (j) infection control reviews; (k) service and program monitoring including multidisciplinary monitoring; (l) autopsy review; and (m) process action teams, id. at pp.2-4;

(2) "**Focused Reviews**," id. at p.4, which address specific issues or incidents, 59 C.F.R. § 17.501 (a)(2), and may take the form of a root cause analysis. A root cause analysis "is a process of identifying the basic or contributing causal factors that underlie variations in performance

7

associated with adverse clinical events or close calls." *Directive 2002-043* at pp.4-5;

    (3)   "**General Oversight Reviews**," id. at p.5;

    (4)   "**External, Clinically-Oriented Reviews**," id. at p.6; and

    (5)   "**Clinical Education Program Accreditation Reviews**." Id.

The final three categories of quality assurance reviews--general oversight reviews; external, clinically-oriented reviews; and clinical education program accreditation reviews--are not at issue in this case.

IV.

The United States withheld 11 documents claiming that they are privileged--under 38 U.S.C. § 5705; 59 C.F.R. § 17.501(a)(2); and VHA Directive 2002-043(4)(a)(2)(d)--as documents involved in a root cause analysis. *Privilege Log* at entries 5-15. VHA Directive 2002-043(4)(a)(2)(d) defines a root cause analysis as a form of focused review, and 59 C.F.R. § 17.501(a)(2) requires that a focused review must be "designated by the reviewing office at the outset of the review as protected by 38 U.S.C. § 5705. . . ." (Emphasis added.)

No document has been provided by the United States demonstrating that a root cause analysis was designated in this case, or the date of its designation. The *Privilege Log* includes Doc. No. 7, which the United States claims is privileged, and which is described as the "Charter Memorandum Medical Center Director convening Root Cause Analysis." The description of Doc. No. 7 states that a root cause analysis was "chartered" on 9/25/2003 and that the "[c]harter memorandum" was signed by the "Director" on 10/6/2003. Neither Doc. No. 7 nor any other document has been provided to me, however, which establishes that the claimed root cause analysis was "designated by the reviewing office at the outset of the review" as privileged, as is

8

required to invoke the protections of 38 U.S.C. § 5705. Nor is there any other evidence, in the form of an affidavit or otherwise, establishing that the reviewing office designated the root cause analysis as protected by § 5705 at the outset of the review.

At oral argument on the Motion to Compel, I expressed my skepticism about the United States' assertions of the quality assurance privilege. I do not doubt the existence or the importance of the privilege. My skepticism concerns the documents which the United States claims to be subject to that privilege. For example, Doc. No 11 on the *Privilege Log* is identified as a document written on September 23, 2003, approximately two weeks after Mr. Bethel's surgery, by Dr. Lyle Kirson, head of anesthesiology, and Dr. Thomas Whithill, chief of surgery. The United States claims that the document is part of a root cause analysis.

According to the plaintiffs, Dr. Kirson was called into the surgery after three unsuccessful attempts to intubate Mr. Bethel. *Motion to Compel* at p.2. "Dr. Kirson's involvement in Mr. Bethel's care on September 10, 2003 is not charted," however. Id.

Dr. Kirson testified at his deposition that he prepared a report "about what happened to Mr. Bethel," with the assistance of De. Whithill. *Plaintiffs' Reply In Support of Their Motion to Compel Discovery [etc.]* [Doc. # 151, filed 3/16/2007] (the "Reply"), Exh.4 at p.19 line 12 through p.20 line 6. Although Dr. Kirson stated that the report "was for quality assurance," id. at p.19 lines16-18, there is no indication that the report was prepared after a root cause analysis was commenced and designated as protected by 38 U.S.C. § 5705.[1]

---

[1] In its *Privilege Log*, first provided to the plaintiffs on March 16, 2007, the United States indicates that Docs. No. 5 through 15 also are subject to the attorney-client privilege. I note, however, that the attorney-client privilege is not asserted in the United States' response to the production requests initially served six weeks earlier, on February 2, 2007, or any of the United States' supplements to those responses that have been provided to me. In addition, the United

The United States has failed to meet its burden to demonstrate that the claimed root cause analysis was "designated by the reviewing office at the outset of the review as protected by 38 U.S.C. § 5705," as required by 59 C.F.R. § 17.501(a)(2). Consequently, the United States shall produce the root cause analysis documents to the plaintiffs.

V.

The United States withheld six documents under a claim that they are a "peer review." *Privilege Log* at Doc. No. 98, 99, 100, 112, 113, and 114.

The privilege log states that Doc. No. 98 is dated February 17, 2004, and describes it as an "external peer review." The United States claims that Docs. No. 99 and 100 are privileged because they constitute an "individual provider profile" and are peer reviews for academic years 2003-04 and 2002-03, respectively. *Privilege Log* at Doc. No. 99 and 100. The United States claims that Docs. No. 112, 113, and 114, all of which are dated August 25, 2003, are peer reviews concerning "resident supervision"; "credentialing compliance"; and "continuing education," respectively.

*Directive 2002-043* recognizes "tort claim peer reviews" as a quality assurance activity privileged under 38 U.S.C. § 5705. A tort claim peer review is defined as "the review of the care provided in cases in which <u>malpractice claims have been filed</u> to identify, evaluate, and, where appropriate, correct circumstances having the potential to adversely affect the delivery of care." *Directive 2002-043* at p.2 (emphasis added). In this case, the plaintiffs' administrative claim form under the FTCA is dated October 12, 2004, and this malpractice action was filed on

---

States does not argue the applicability of the attorney-client privilege in its *Response* to the *Motion to Compel*. Consequently, I find that any claim to the attorney-client privilege with respect to these documents is both waived and abandoned.

July 15, 2005. Document No. 98 does not qualify as a "tort claim peer review" under *Directive 2002-043* because it was prepared approximately eight months before any malpractice claim was filed administratively, and nearly one and one-half years before this civil action was filed. Document No. 100 is dated October 1, 2003, prior to the filing of any malpractice claim either administratively or judicially. Consequently, it does not qualify as a "tort claim peer review" within the meaning of *Directive 2002-043*.

The description of Doc. No. 99 is identical to the description of Doc. No. 100, except that it relates to the 2003-2004 academic year. *Directive 2002-043* provides with respect to tort claim peer reviews that "*[r]eviews conducted entirely for other purposes, such as representing the United States in tort claim litigation, are not included." Directive 2002-043* (original emphasis). There is no indication that Dr. Stover was the subject of a malpractice claim in academic year 2002-03; consequently, that individual provider profile must have been prepared for some purpose other than "to identify, evaluate, and, where appropriate, correct circumstances having the potential to adversely affect the delivery of care" stemming from the filing of a malpractice claim. The United States has failed to establish that the identically described individual provider profile for academic year 2003-04 was prepared for a reason other than the reason underlying the preparation of the analogous profile prepared the previous year. Consequently, I conclude that Doc. No. 99, like Doc. No. 100, was not prepared in response to the filing of a malpractice claim and to "identify, evaluate, and . . . correct circumstances having the potential to adversely affect the delivery of care," but for entirely other purposes.

Documents No. 112, 113, and 114 all predate the filing of any administrative or judicial malpractice claim and, in fact, predate the surgery underlying Mr. Bethel's injury. Consequently, they do not qualify as peer reviews protected as privileged within the meaning of *Directive 2002-043* and 38 U.S.C. § 5705.

The United States has failed to establish the applicability of the claimed "tort claim peer review" privilege with respect to Docs. No. 98, 99, 100, 112, 113, and 114. Consequently, the United States shall produce those documents to the plaintiffs.

VI.

The United States withheld two documents claiming that they are privileged as morbidity and mortality reviews. *Privilege Log* at Docs. No. 101-102.

Document No. 101 is dated September 10, 2003, the day of Mr. Bethel's surgery, and Doc. No. 102 is dated January 11, 2003. Both are described as "anesthesiology morbidity and mortality review sheet[s]." Id. The privilege log indicates that the intended recipients of these review sheets included (1) VA General Counsel and Regional Counsel staff; (2) DVAMC leadership; (3) QM staff; (4) medical staff personnel; (5) Professional Standards Board members; (6) University Hospital anesthesia staff at M&M conference. Id.

*Directive 2002-043* defines a morbidity and mortality review as follows:

> These are discussions among clinicians of the care provided to individual patients who died or experienced complications. These discussions are scheduled and usually labeled as Morbidity and Mortality Conferences. Activities which involve preliminary reviews of care to provide material for consideration at Morbidity and Mortality Conferences are included [within the privilege]. If non-VA practitioners from affiliated facilities attend Morbidity and Mortality conferences, there needs to be prior written designation of the role of these individuals if documents from these conferences

12

> are to be confidential. In addition, Section 5701 bars access to
> non-VA personnel to VA medical records or other documents
> identifying individual VA patients unless the identifying information
> has been deleted.

*Directive 2002-043* at p.2.

The date of Doc. No. 101, combined with the fact that the review sheets were intended to be distributed to lawyers and University Hospital staff, who are non-VA personnel, casts considerable doubt as to whether they are morbidity and mortality reviews, or preliminary reviews to provide material for consideration at a morbidity and mortality conference, within the contemplation of *Directive 2002-043*. Nor is there any indication that the United States complied with the requirement that there be a "prior written designation of the role of [any non-VA practitioners] if documents from these conferences are to be confidential," which is a prerequisite to invoking the morbidity and mortality portion of the privilege created by § 5705. Consequently, the United States has failed to carry its burden to demonstrate that the privilege created by § 5705 applies to the claimed morbidity and mortality review sheets. The United States shall produce Docs. No. 101 and 102 to the plaintiffs.

## VII.

The United States withheld nine documents under a claim that they are anesthesiology quality assurance control drug records. *Privilege Log* at Doc. No. 103-111. The *Privilege Log* identifies the dates of these documents as ranging from July 2002 to September 2003, and states that their intended recipients are "VA General Counsel and Regional Counsel staff, DVAMC leadership, QM staff, Medical staff personnel, [and] Professional Standards Board members."

13

*Directive 2002-043* recognizes "Drug Usage Evaluations" as a quality assurance activity privileged under 38 U.S.C. § 5705, and defines those evaluations as:

> [R]eviews to assess the safety, appropriateness, and effectiveness of drugs prescribed by physicians. The dose, route, and time schedule chosen are often reviewed, as well as the drug selected. Adverse drug event reports are included.

*Directive 2002-043* at p.3.

From the description of the documents and their intended recipients, it is far from clear that these documents are "drug usage evaluations" subject to the privilege created by § 5705. There is no indication that the documents concern drug dosage, routing, or schedule of use, nor that they evaluate the drugs selected. I am left to wonder why documents purportedly prepared to "assess safety, appropriateness, and effectiveness of drugs prescribed" are sent to lawyers.

The plaintiffs state, without dispute by the United States, that no one in the operating room "contemporaneously documented the amounts and identity of the medications administered" to Mr. Bethel. *Motion to Compel* at p.2. I do not understand how any document could constitute a drug usage evaluation concerning the drug dosage, routing, scheduled use, or selection when there are no records of the drugs administered.

When I construe the drug usage evaluation portion of the quality assurance privilege narrowly, Nixon, 418 U.S. at 710, I cannot say that the United States has made a clear showing that it applies to Docs. No. 103-111, or that the United States has provided sufficient information to enable me to determine whether each element of the drug usage evaluation portion of the quality assurance privilege is met. Consequently, the United States shall produce Docs. No. 103-111 to the plaintiffs.

VIII.

Finally, the United States withheld one document claiming that it is privileged as a "patient safety report." *Privilege Log* at Doc. No. 115. *Directive 2002-043* recognizes "Adverse Event and Close Call Reporting" as a quality assurance activity privileged under 38 U.S.C. § 5705. I assume that this is the basis of the United States' claim of privilege with respect to Doc. No. 115.

Adverse Event and Close Call Reporting is defined as follows:

> This is the reporting, review, or analysis of incidents involving patients that cause harm or have the potential for causing harm. Employees becoming aware of such incidents report them to the medical center. . . .  VA Form 10-2633, "Report of Special Incident Involving a Beneficiary," or similar forms, and follow-up documents, unless developed during or as a result of a Board of Investigation, are confidential and privileged. Confidential documents, such as Reports of Special Incidents, which lead to a Board of Investigation are not confidential.

*Directive 2002-043* at p.3.

Document No. 115 is dated September 10, 2003, the day of Mr. Bethel's surgery, and the author was Tina Nelson, one of the nurses in the operating room with Mr. Bethel and the surgical team. This document is an adverse event or close call report within the contemplation of *Directive 2002-043*, and it is privileged under the quality assurance privilege of 38 U.S.C. § 5705.

IX.

IT IS ORDERED that the Motion to Compel, insofar as it previously was taken under advisement, is GRANTED IN PART and DENIED IN PART, as follows:

DENIED insofar as it seeks the production of Doc. No. 115 on the *Privilege Log*; and

GRANTED in all other respects.

IT IS FURTHER ORDERED that the defendants shall produce the documents identified on the *Privilege Log* as Documents Number 5-15; 99, 100, 112, 113, and 114; 101-102 and 103-111 to the plaintiffs on or before **April 30, 2007**.

Dated April 16, 2007.

                                      BY THE COURT:

                                      s/ Boyd N. Boland
                                      United States Magistrate Judge