IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 05-cv-01336-RPM

SHARON BETHEL, Individually and as Conservator and Guardian of
DAVID BETHEL, an incapacitated person,

     Plaintiffs,

v.

UNITED STATES OF AMERICA,

     Defendant.

_____

FINDINGS AND CONCLUSIONS
_____

David Bethel sustained global hypoxic ischemic injury to his brain during treatment as a surgical patient at the Denver Veterans Affairs Medical Center ("DVAMC" or "VA Hospital") on September 10, 2003. He and his wife, Sharon Bethel, seek damages under the Federal Tort Claims Act, 28 U.S.C. § § 2671, *et seq.*, for negligence in the performance of services by the medical personnel assigned to provide professional care to him. The VA Hospital is a teaching facility sharing faculty and staff with the University of Colorado Health Sciences Center under contractual agreements described in this Court's Order Determining Vicarious Liability for Anesthesiologist entered in this civil action on September 17, 2008.

The surgery scheduled for Mr. Bethel was an examination under anesthesia for a probable fistulotomy in his anal area. That was elective surgery to be performed by Dr. Frank Chae, a general surgeon, with the assistance of Dr. Joel Baumgartner, a first year resident who started in June, 2003.

On September 9, 2003, Shirley Pfister, a nurse practitioner employed by the VA, examined Mr. Bethel and prepared a pre-operative assessment report. Exhibit A-3. The plaintiff's recorded weight was 275 lbs. and height was 5'11". His age was 40. Ms. Pfister remembered that he appeared to be in great shape, like a football player with no apparent physical problems. The only reported allergy was for shellfish causing swelling. The history shown included unspecified head trauma and unconsciousness, heartburn and reflux. Ms. Pfister reported that the patient had a short neck with good range of motion with a normal EKG and normal lab results. She did not note any special needs for evaluation by the anesthesiologist.

Dr. Robin Slover was the anesthesiologist assigned to care for Mr. Bethel by the VA Hospital's Chief Anesthesiologist, Dr. Lyle Kirson, who also assigned Dr. Nicole McDermott, a resident who began her anesthesiology training on July 1, 2003, to assist Dr. Slover.

The plaintiff's surgery was scheduled for Operating Room 3 ("OR 3") at 9:30 a.m. on September 10, 2003. Dr. McDermott assisted Dr. Kirson as the anesthesiologist in a hernia repair surgery in OR 3 at 7:30 a.m. that morning and she completed a clinical record for it as required by the hospital. Exhibit 6. That form showed that the anesthesia machine monitors had been checked. Dr. John Sandoval, a surgical intern, accompanied Dr. McDermott. When the first surgery had been completed and the patient went to recovery at 8:42 a.m., Dr. McDermott told Dr. Sandoval to interview Mr. Bethel in the pre-operative area outside the operating rooms.

The drugs used in surgery that are controlled substances under Federal law are stored in a pharmacy near the operating rooms. When they are drawn, a technician

2

records what is taken for each patient's case and the anesthesiologist signs the form and is responsible for returning unused drugs. Dr. McDermott signed for one 5m vial of Versed (brand name for Midazolam) and two 5m vials of Fentanyl for Mr. Bethel's surgery. Exhibit 43. The time of day was not recorded. Versed is a sedative and Fentanyl is a narcotic for pain control. Dr. McDermott does not recall when she obtained these vials from the pharmacy. There was no standard practice. At times she and others obtained the drugs to be used for more than one procedure at the beginning of the day.

Mr. Bethel was seen in the preoperative holding area by Dr. Baumgartner who explained the procedure and risks involved in the surgery in obtaining the patient's consent. Mr. Bethel elected general anesthesia. Dr. Baumgartner did not observe any unusual anxiety. Dr. McDermott saw Mr. Bethel with Dr. Sandoval at about 8:47 a.m. in the holding area. She interviewed him as a part of the regular anesthesia evaluation process. Dr. McDermott completed the pre-anesthetic summary page of the clinical record anesthesia form. Exhibit 8. No expected problems were noted.

A standard practice of anesthesiologists is to classify the patient's airway access on a scale of I as least to IV as most difficult. Ms. Pfister had recorded IV on her report. Dr. McDermott examined the plaintiff and thought that II or III was appropriate. She did not put a rating on the form. Dr. Slover joined Dr. McDermott in the holding area and signed the form at 9:00 a.m.

When Mr. Bethel was in OR 3 at 9:20 a.m. with monitors and oxygen mask in place he had been given 2 mg of a drug thought to be Versed for sedation. The only medication recorded by Dr. McDermott on Exhibit 8 was 30cc of Bicitra given in the

3

holding area because of the patient's history of reflux.   Dr. Slover was called to OR 4 where a patient was waking up from anesthesia.

Standard practice calls for the administration of pure oxygen through a mask for five minutes to provide oxygenation of the patient's body before administering the anesthesia drugs which paralyze the respiratory system. That provides a margin of safety for the time required to intubate the trachea to enable the anesthesia machine to breathe for him.  Soon after the mask was placed on Mr. Bethel, he sat up on the operating bed, became agitated and tried to remove the mask.  While Dr. McDermott and Dr. Baumgartner restrained him, Tina Nelson, the circulating nurse in attendance, summoned Dr. Slover who came into the room and proceeded with a rapid sequence induction, administering the anesthesia drugs, requiring immediate intubation and ventilation of the patient.

Dr. McDermott and Dr. Slover were not successful after several attempts at intubation, including the use of a Bullard Laryngoscope that permits visual inspection of the structures in the throat.  When Nurse Nelson announced that she could not palpate a pulse, Dr. Baumgartner began chest compression with Dr. Slover holding the mask on Mr. Bethel's face and Dr. McDermott squeezing the bag.

An emergency call for help went out over the speaker system on the operating floor and there were many responders.  This type of emergency at the VA Hospital requires immediate response from all who are in the area who can provide help.  Dr. Kirson was among the first to arrive.  He immediately moved to the head of the bed, moved Dr. Slover aside and used a two handed jaw thrust to disengage Mr. Bethel's lower jaw, opening his throat wider for oxygen to enter through the mask.  Dr. Slover

pumped the bag.

Dr. Chae was called in to help. He decided to establish a surgical airway. Dr. Chae could not feel the cricothyroid bone in the patient's neck to enable him to perform a cricothyreotomy. The surgeon attempt a retrograde intubation by inserting a guidewire up toward the mouth in the hope that it could be pulled up and a tracheal tube placed down over it. When the mask was lifted, the wire could not be found. Dr. Chae then started the incision to cut into the trachea. He had difficulty and an ENT surgeon came to his assistance. At that time, Helen Kippenham, a nurse anesthetist, came in from OR 1 and placed her two hands on the mask beside those of Dr. Kirson who was beginning to tire from holding the patient's jaw.

When the surgeons placed a pediatric size tracheal tube in Mr. Bethel, frothy pink fluid was expelled with such force that it went to the foot of the bed. That was evidence of a pulmonary edema. Mr. Bethel's vital signs showing on the monitor on the anesthesia machine showed recovery. He was taken to the intensive care unit where ENT surgeons repositioned a tracheal tube. All parts of Mr. Bethel's brain have been damaged from lack of oxygen.

There is no material dispute about the facts stated up to this point. It is agreed that the decision to proceed with the rapid induction sequence by Dr. Slover when she came into the room had fateful consequences for Mr. Bethel. The government has contended that the only negligence in this case is that of Dr. Slover in making that decision without adequately assessing the patient's condition and without first ensuring that the patient's airway could be secured safely. The government faults Dr. Slover for failing to promptly seek additional medical assistance in intubating or ventilating the

5

patient when she should have been aware of the developing emergency.

The government filed a notice of concession of this negligence and proceeded to trial in an attempt to isolate her as the only person at fault, continuing in the litigating position that there is no government liability because she was not a government employee, despite this Court's ruling on vicarious liability.

The government's legal position is not tenable.  It is not possible to assess or apportion fault among the participants in the care of David Bethel from the evidence presented at this trial because there was a systemic failure to prepare or preserve contemporaneous medical records and a failure to make an adequate investigation to reconstruct what happened when memories were sufficiently fresh to be reasonably reliable.  The record keeping in this case was far below the standard of care of a hospital providing general anesthesia services.

This civil action was filed on July 15, 2005, after compliance with the administrative claim procedure required by the FTCA.  Because of procedural delays, depositions did not begin to be taken before January, 2007, when memories had already faded.  There are many inconsistencies and some conflicts in the testimony received at trial and in the records that have been provided as exhibits.  There is little to assist in determining credibility of the witnesses.

The plaintiffs addressed the difficulties in this case in their Motion for Sanctions Due to Spoliation of Evidence, filed on October 15, 2007.  In its response, filed on November 13, 2007, the government concedes the absence of records but denies the application of the spoliation doctrine because there is no basis for finding intentional destruction of records.  While that much is true, the absence of records requires that

findings on disputed factual issues must be based on inferences to a degree not to be expected in a medical negligence case.

There is no contemporaneous anesthesia record showing that the anesthesia machine monitors were checked, giving any recording of vital signs before asystolis or the delivery of any medications. The lack of this record is partly explained by the customary practice of completing this form after the patient is stable and asleep under anesthesia and that did not occur in this case. The recollections of the witnesses are conflicting. There is agreement that either Dr. Slover or Dr. McDermott injected some medication at about the time Mr. Bethel was placed on the operating bed.

The patient's behavior and symptoms displayed when he sat up on the surgical bed are consistent with a 2 cc dose of Rocuronium, a paralytic used during inducement, and they are inconsistent with the dosage of Versed Dr. Slover prescribed. The fair inference is that the wrong drug was given and this medication error was the precipitating cause of the chain of events that resulted in brain injury. There is so much conflict and confusion in the relevant testimony that it cannot be determined by a preponderance of the evidence whether Dr. McDermott put the wrong label on the syringe or whether either Dr. Slover or Dr. McDermott picked up the wrong syringe.

The monitor on the anesthesia machine displays continuous pulse oximetry readings of oxygen saturation of the blood and the pulse; blood pressure at five minute intervals; continuous electrocardiogram; expired end-tidal carbon dioxide concentration and body temperature. There is no record of those readings during Mr. Bethel's time in OR 3. The machine stores the readings at five minute intervals for 24 hours. After Mr. Bethel was in ICU, Dr. McDermott and Dr. Slover went back into OR 3 to check the

monitor and found that the machine had been turned off. They attempted unsuccessfully to recover the expected stored record with the assistance of a technician.

The VA Hospital requires that someone keep a record of the treatment provided and drugs administered during a cardiac or respiratory emergency ("CORE"). It is the responsibility of the doctor in charge of the situation to direct that such a record be made and retained. Dr. Kirson was that person in this case. The VA Hospital has not produced a CORE record for this case and has no explanation for its absence. No witness has identified anyone as having been assigned the task of recording. The absence of the appropriate records is consistent with the testimony of the witnesses that there were as many as 50 people in OR 3 with considerable confusion. No one took charge of the scene. Dr. Kirson was the most senior and most experienced staff person present and he would be expected to give directions during this emergency.

Dr. Slover prepared a narrative report of Mr. Bethel's case in the afternoon of September 10, 2008. Exhibit 12. She wrote from her recollection of what happened while discussing the case with Dr. McDermott. Their recollections were different. Dr. Slover wrote that the patient's vital signs were stable throughout the induction and intubation attempts. She reported that after neither she nor Dr. McDermott could find the epiglottis and chords "THE OXYGEN SAO2 WAS NOTED TO OCCASIONALLY NOT MEASURE, BUT THE MEASUREMENTS OBTAINED (MOST OF THE TIME) WERE ABOVE 87%." (*Id*).

In the absence of any contemporaneous objective indicators of Mr. Bethel's condition and the conflicting recollections in the testimony of the witnesses, the opinions

8

expressed by the expert witnesses conflict as to the more probable explanations for this catastrophic injury.  Considering all of the evidence, the opinions expressed by Dr. Sheldon Deluty are the most plausible.

In Dr. Deluty's opinion, Dr. Kirson should have attempted ventilation and oxygenation of Mr. Bethel by use of a laryngeal mask airway ("LMA"), a device that is inserted into the patient's pharynx to open an airway as an alternative to intubation. The VA Hospital adopted a practice guideline prepared by the American Society of Anesthesiologists called the Difficult Airway Algorithim (Exhibit 49).  It recommends that when intubation attempts have not been successful and face mask ventilation is not adequate, the doctor should consider attempting the use of an LMA.  Considering the published success rate of this procedure, the use of it may have revived the flow of oxygenated blood to Mr. Bethel's brain much earlier and thereby reduced the amount of damage.

Dr. Kirson was experienced with an LMA and was aware of the algorithim.  He declined use of it because he thought the patient's airway was obstructed by a laryngospasm and edema.  While the failed intubation attempts may have caused swelling, the explanation is not plausible given his other reason–that ventilation was being provided by the mask and bagging.

Whether the LMA attempt would have been successful may require speculation; but its use was within the expected standard of care and Dr. Kirson's reasons for proceeding on to the surgical intervention are not persuasive.  Additionally, the blood gas readings from the arterial blood taken at 9:46 a.m. show that there was inadequate oxygenation of the organs.

The evidence taken as a whole proves that the treatment of David Bethel was below the standard of care for general anesthesia prior to elective surgery and that no one of the participants in his care has individual responsibility for his brain injury. The defendant's efforts to limit liability by attributing all fault to Dr. Slover fail because there is insufficient evidence to warrant isolation of her as the causative agent. There was a medication error and it cannot be determined whether it was caused by Dr. Slover or Dr. McDermott. There was a treatment error in proceeding with a rapid induction sequence without an adequate assessment of Mr. Bethel's condition. Again, that fault is not attributable to Dr. Slover alone. She was not present when Mr. Bethel showed signs and symptoms of the partially paralyzing effects of Rocuronium and Dr. McDermott did not recognize the significance of his difficulty in breathing and failed to communicate that to Dr. Slover. Dr. Slover's assumption that her patient may have a stress disorder was reasonable with what she was told at the time. Indeed, the defendant's expert witness, Dr. Swift, a neurologist, opined that Mr. Bethel had a panic attack.

The inability of the nurse to feel a pulse is evidence that the patient's heart was not pumping blood with enough pressure to circulate through his body. The electrical activity in the heart may have continued. The insufficient blood circulation was not a sudden event. Those in OR 3 should have observed a developing bradycaridia from the vital signs on the monitor. The pulse oximeter beeps when the SAO2 falls below 90. The nurse recalled hearing it beeping. Because the brain is more vulnerable to injury from hypoxia than the heart, there may have been brain damage before the loss of the pulse but time is critical and the amount of damage may have been minimal if the patient's condition had been assessed earlier from the monitor display and warnings.

Both Dr. Slover and Dr. McDermott should have become aware of what was happening and should have called for help.

The evidence is insufficient to apportion the injury to any one time or event. Mr. Bethel did not have adequate oxygen in his blood or adequate circulation of his blood to his brain for a substantial amount of time as a result of negligent treatment by those responsible for his care at the DVAMC. Accordingly, it is

ORDERED, that the United States of America is liable to the plaintiff for damages sustained by David Bethel as a result of negligent treatment of him as a patient at the Denver Veterans Affairs Medical Center on September 10, 2003, in amounts to be determined in further proceedings in this civil action.

DATED: November 28th, 2008

BY THE COURT:

s/Richard P. Matsch
_____
Richard P. Matsch, Senior District Judge